# SURROGATE'S COURT — COUNTY OF NEW YORK.

## IN THE MATTER OF THE PROBATE OF THE LAST WILL, &c., OF FREDERICK ROLLWAGEN, deceased.

*Will and codicil denied probate on the ground of want of due execution, testamentary incapacity of decedent, and undue influence exercised over him.*

Frederick Rollwagen, the testator, died in the city of New York on the 11th of October, 1873, at the age of sixty-six years, leaving, as next of kin and heirs at law, three adult sons, seven grandchildren, the family of a deceased daughter; also left a widow (his third wife), who had a child born about one month after his death. The other heirs were children by the first marriage. He also left, at the time of his death, real and personal property worth about $800,000, mostly in real estate.

The application for the probate of the will, which was dated the 17th of June, 1873, and the codicil, which was dated on the 5th of September, 1873, was made and supported by the widow, named as executrix, and her two brothers, Henry and George Herrmann, named as two of the executors. Frederick Rollwagen, Jr., the testator's eldest son, was also named as one of the executors, but did not join in the application for probate, but joined with his brothers in contesting both the will and codicil.

The will and codicil gave to the widow a much larger proportion of the estate than would have been her share had the decedent died intestate.

In this proceeding the surrogate examined sixty-eight witnesses, whose testimony covered over 1800 printed pages, and, as a final result, came to the conclusion:

1st. That the requirements of the statute had not been observed in the *execution* of the papers offered for probate;

2d. That the decedent, at the time of the alleged execution, was not possessed of *testamentary capacity;* and

3d. That the execution was the result of *undue influence, fraud and circumvention* exercised over the mind of the decedent by his wife and her brother Henry Herrmann.

*Henry L. Clinton, George F. Langbein, Macolm Campbell & David R. Jacques,* for contestants.

*William Henry Arnoux, and Ritch & Woodford,* for respondents.

ROBERT C. HUTCHINGS, *Surrogate.* — The decedent was, at the time of his death, of the age of sixty-six years. He was a native of Alsace, one of the German Provinces of France, and was, as his name would indicate, of German lineage and language. He came to America in the year 1829. He died on the 11th of October, 1873, leaving, as next of kin and heirs at law, three adult sons, all married, the eldest of whom is forty years of age, and seven grandchildren, the family of a deceased daughter, Mrs. Sarah Browning. The three sons and the mother of the seven grandchildren were children born of his first marriage. About the year 1866, he contracted a second marriage, of which there was no issue, the wife only surviving her marriage about a year. On the 19th day of September, 1871, he was married for a third time, to Magdalena Herrmann, who survives him as widow.

The decedent was by occupation a butcher, and by strict attention to business, thrifty and economical habits, and judicious investments in real estate, he had accumulated real and personal property worth, at the time of his death, about $800,000, much the larger portion of which is in real estate.

The two papers propounded for probate, respectively, as the will and codicil of the decedent, and which are the subject of controversy, were executed, according to the claim of the proponents, the will on the 17th day of June, 1873, and the codicil on the fifth day of September of the same year.

By the provisions of the first paper, the widow is given, absolutely, the house occupied by the decedent at the time of his death, known as No. 312 East Ninth street, with all the personal property therein, for her own use, also one-third of all other personal property, absolutely, besides one-third of the rents and income of all his other real estate for life. The remaining personal property is to be divided in four equal shares, one share to belong to each of the sons, and the

In the Matter of Rollwagen.

remaining share to be invested for the children of his deceased daughter, Sarah Browning, to be paid over to said children when they shall respectively attain the age of twenty-one years. . It directs the remaining part of the rents. of his real estate to be divided into four equal shares, one-fourth to be given each of his sons, and the remaining fourth to be invested for the benefit of the children of Mrs. Browning. It further directs that none of his real estate shall be sold, or disposed of, or divided, during the lifetime of his wife; nor after her death, until the youngest of his grandchildren, then living, shall have attained the age of twenty-one years. It provides that his children shall only have the income of his real estate during their natural lives, and that the fee thereof shall become vested in their issue them surviving, and the surviving issue of his deceased daughter, Mrs. Browning, when the youngest of his grandchildren then living shall have attained the age of twenty-one years. It provides that Henry Herrmann, the brother of the widow, shall let and rent all his real estate, and collect and receive all the rents, and shall receive three per cent commission on the gross amount collected; and it appoints his wife, Magdalena, executrix, and her brothers, Henry Herrmann and George Herrmann, and Frederick Rollwagen, Jr., executors of the will.

The witnesses to the alleged will are Joseph Bellesheim, of West Mount Vernon; Dr. Henri Goulden, of No. 22 East Twenty-second street; and John Theisz, of No. 331 East Ninth street.

The paper propounded as a codicil recites that, whereas, by his will, the decedent has given to his wife the house No. 312 East Ninth street, with the personal property therein mentioned; and further, that in order to better her condition, he devises to her, in addition, four houses and lots, known as Nos. 165, 167, 169, 171 Avenue A; and further, that, by his will, he had made no provision for any child or children who might be born afterward by his wife; he therefore gives,

devises and bequeaths, to each of such thereafter born children, an equal share of his estate, real and personal, in the same manner as bequeathed to his children named in his will; and that all of his children born and to be born shall each take an equal portion, or share, of his remaining real and personal estate, instead of one-fourth part, as stated in his will; and he confirms and ratifies his former will in all particulars other than those changed by the codicil.

The same persons were the subscribing witnesses to the codicil as to the will.

All of the children of the decedent who are of adult age, the youngest being twenty-two and the eldest forty, and his grandchildren, the children of Mrs. Browning contest the validity of the papers propounded, the latter through their special guardian. The supporters of the validity of the papers are the widow of the decedent, Magdalena Rollwagen, named also as executrix of the will, and her brothers, Henry and George Herrmann, named therein as two of the executors. Frederick Rollwagen, Jr., the eldest son of the decedent, and who is also appointed an executor, did not join in the petition for probate.

The contestants filed objections to the admission of the papers to probate, in substance, as follows:

1. That the papers were not the will and codicil of the decedent.

2. That the decedent did not sign the papers, or either of them.

3. That he did not sign them in the presence of each or either of the attesting witnesses.

4. That he did not acknowledge the subscription to the papers, or either of them, to each or any of the subscribing witnesses.

5. That if he did so subscribe them, or either of them, or at the time of the acknowledgment thereof, if he so acknowledged them, he did not declare them to be his last will or a codicil thereto respectively.

6. That the attesting witnesses did not, or either of them, sign, as such, at the request of the decedent.

7. That the decedent was not, at the time the papers purport to have been executed, possessed of testamentary capacity.

8. That the execution of the papers, if executed by the decedent, was obtained by fraud, circumvention and undue influence, practised upon the decedent by Magdalena Herrmann, otherwise called Magdalena Rollwagen, claiming to be widow of the decedent; Henry Herrmann, George Herrmann, and their mother; and John Theisz, one of the subscribing witnesses thereto.

9. That the papers were not freely and voluntarily executed by the decedent, but that the subscription to each of them and the publication thereof, if subscribed and published by him, were procured by fraud, restraint and coercion exercised upon him by the same parties.

10. That each of the papers is invalid in law, illegal and void in each and every provision thereof.

A posthumous daughter, born of the widow, also appears by her special guardian as a contestant, upon substantially the same grounds as those above stated.

In all sixty-eight witnesses were examined in the proceeding, and their testimony is very voluminous, covering over 1800 printed pages.

I shall only consider, in this opinion, the salient features of the case, as I view them and as they appear from the testimony; much of which, in this, as in nearly all cases of contests on the probate of wills, I find upon examination, to be immaterial, and not germane to the real issues in the case.

The relations of the parties to a proceeding are always important in considering the questions that arise in contests in this court, and often have a direct bearing upon the issues pending.

The maiden name of the widow, Magdalena Rollwagen, was Herrmann. She was a niece of the first wife of the

decedent, and was commonly known and addressed in the family by the appellation of "Lena." She is a woman of between forty and forty-five years of age. Twenty-one years since, on her first arrival in this country, she was employed as a domestic in the family of the decedent and his wife, her aunt, for a brief period; and, so far as appears by the testimony, it was not until 1869, that she again became a member of his household, being then employed in the position of housekeeper and attendant upon the decedent, after his health had become seriously impaired, at a salary of fourteen dollars a month. At the time of her last employment, the decedent was living in the dwelling which has been designated as the "old house," No. 334 East Ninth street.

Henry Herrmann, her brother, named in the will as an executor, up to the time of the marriage of the decedent with his sister, had no intimacy with him other than that which would grow out of relationship by the marriage of his aunt, the first wife; and even in view of that relationship, their interviews were only casual and very infrequent. Herrmann was latterly engaged in a small business as a grocer on Houston street, but after his sister's marriage, he removed his business to Avenue A, occupying a store in one of the decedent's houses, and continued in such business until the month of June, 1873, when he became the agent of the decedent's estate under a claim of employment by him for collecting rents and caring for his property. Some months previously thereto, at the time the youngest son of the decedent, George, left for California, he had been intrusted with keeping his books of account.

So far as the relations existing between the decedent and his children are concerned, the testimony fails to show that there was any but the most kind parental feeling on his part toward them, and filial devotion manifested on their part toward him. I do not consider the family differences appearing in this case such as to justify the assumption, by the proponents, of the existence of hostile feelings on the

part of the decedent toward any of his children or grand-children; but to have been, rather, such differences only as were slight, temporary in duration, and liable to occur in households, and which it would be unjust and unreasonable to regard as evidence of diminished affection or permanent discord, and it seems to me that only perverted interest or malevolence could so construe them.

The paper propounded as the will certainly appears to be inequitable in its provisions, when the number and relations of his immediate kindred and all the circumstances of the case are considered; as by the will there is given to the widow a larger proportion of the estate than would have been her share had the decedent died intestate. The paper propounded as a codicil largely increases the provisions for her benefft, in that it gives to her, still further, the four houses and lots on Avenue A. The will also practically deprives, to a great degree, the eldest son, Frederick Roll-wagen, Jr., who is named as executor, of any powers in such capacity, in that it vests, and the codicil continues, the super-vision and management of the estate in Henry Herrmann, as to letting and collecting rents of real estate, until the young-est grandchild of the decedent becomes of age. Except that Frederick has co-ordinate power to pay debts, the authority of Henry Herrmann practically excludes him from a large part of the management of the estate for fourteen years, the youngest grandchild being at the present time only seven years of age.

The issues which are properly before me for my determi-nation, upon the evidence which has been presented in the case, are, in substance :

1. Were the requirements of the statute observed in the execution of the papers offered for probate ?

2. Was the decedent, at the time of the alleged execution, possessed of testamentary capacity ?

3. Was the execution the result of undue influence, fraud or circumvention, exercised over the mind of the decedent by his wife and her brother Henry Herrmann, or either ?

The physical condition of the decedent is very important, to be considered, in endeavoring to arrive at a proper conclusion upon the issues involved. It is not disputed by the proponents that he was ill and very feeble for a long period previous to his death. Even Dr. Goulden, the physician who attended him, and who was one of the subscribing witnesses to the will and codicil, admitted that he was an invalid during the last year of his life. He was a man who had been, during his life, addicted to the excessive use of stimulating drinks, and it appears from the testimony that, at times, he drank to great excess. His malady, up to the year 1869, so far as the testimony discloses it, was rheumatism. For some years previous to that period, he was obliged to use a cane in walking, although naturally a man of great physical strength. In the year 1870, the proofs show that he was afflicted with a difficulty of speech, which was the occasion of remark by those who knew him, and this difficulty continued to increase.

During the years 1871 and 1872, and up to the day of the decedent's death, I am satisfied he was suffering from paralysis, which rendered it exceedingly difficult for him to move without assistance, and that it was the paralysis which affected his speech, and finally rendered it impossible for him to articulate words intelligibly to others. He undoubtedly became more and more feeble during the last year of his life. The evidence shows that he was unable to dress himself, to attend to his most ordinary wants, or even to control the calls of nature, and that he was in a condition of hopeless physical dependence upon those around him.

Although the results of the disease from which the decedent was suffering may have been manifest to a large number of lay witnesses, who have been examined in this case, yet its character must be decided upon the testimony of the professional witnesses.

Dr. Henri Goulden, who had been the attending physician of Mrs. Rollwagen, before and after her marriage, and who was called in professionally to attend upon the decedent, tes-

tified that he visited him in the year 1871 twelve or fourteen times, and that he was then suffering from rheumatic neuralgia — sciatica — and that he did not have paralysis.   He also treated him for tapeworm and for colds.   He ceased his visits in September, 1873, subsequent to the execution of the codicil, on account of his own illness, and by reason of which the other professional witness, Dr. Marcus C. Tully, was called in.

In respect to the illness of the decedent, and his possible condition during the time that he professionally attended him, Dr. Goulden conceded that he was in an exceedingly helpless state, and had been so for many months previous to the execution of the papers propounded, and that he experienced great difficulty of speech.

The testimony of Dr. Tully, a witness who was called on the part of the contestants, is, to my mind, controlling in the conclusion that the malady of the decedent was not merely sciatica, but that, during all of the year 1873, he was afflicted with paralysis in the form of hemiplegia.   Dr. Tully's statements were very frank and clear, and to all appearances disinterested.   He was called to attend the decedent during the last of September, 1873, by reason of the serious illness of Dr. Goulden.   He testified that he continued his visits until the eleventh day of October, when the decedent died, and that, in his judgment, the cause of death was paralysis; that it was one of the slow forms of that disease; and, from all the indications, the decedent had been afflicted with it for two or three years; and that he was informed by the decedent's wife, in reply to a question he addressed to her, that the first attack had occurred some three years before.   Dr. Tully enumerated the manifestations of the disease.   From an examination, he was satisfied that it was in an advanced stage, and that there was little hope of recovery.   When he first went to see him, decedent was sitting up in a chair, and seemed to be unable to help himself to anything.   During all the time Dr. Tully attended him, up to the day of his death, he states that the decedent did not speak or pronounce a word or syllable that

he could understand; that he could not articulate, and that if he had possessed the strength, by reason of the paralysis of his tongue, he could not have spoken; and when he asked the decedent in reference to his symptoms, Mrs. Rollwagen told him what she asserted the decedent had said. On his cross-examination, Dr. Tully testified that he believed the hemiplegia from which the decedent suffered was on the right side; that a genuine case of that disease affects one side of the body down through from the brain. The symptoms which indicated to him the duration of the disease were stupor, showing an increase of serous effusion of the brain, and dropsy in the extremities, and debility; that stupor is considered one of the symptoms, and is an indication of pressure upon the brain, which produces hemiplegia; that when he first saw the decedent he was feeble, weak and dropsical about the extremities, and in a stupor, and that he had to speak to him two or three times to arouse him; that the decedent attempted to make answer to his question, something which he could not understand, but it was a gutteral sound, and that his tongue was paralyzed. He further stated that the decedent's wife was always present when he made these sounds, and always told him what she claimed the decedent meant. From what he saw of the decedent, he thinks he was hardly able to walk in the months of August or September, without a great deal of assistance; but that he might, by helping, drag his feet along.

The testimony of these two witnesses, therefore, disagree in this respect; that, whereas Dr. Tully testified that the decedent was afflicted with paralysis, in the form of hemiplegia, Dr. Goulden did not recognize in him the existence of any such disease, but treated him only for sciatica, tapeworm and some minor ailments. Both agree as to the affection of the throat. Dr. Goulden admitted that the decedent had great difficulty in speech, and Dr. Tully testified that the difficulty was the result of paralysis.

Having thus presented my conclusion as to the nature of

the disease with which the decedent was afflicted, I will now proceed to consider whether, from his physical condition before and at the time of the execution of the papers propounded as his will and codicil, and from his incapacity to speak, it was possible for him to give certain expression to his wishes in respect to testamentary dispositions of his property, so that they might be embodied in a written instrument; and if there existed, on his part, any means of communication by which the subscribing witnesses could judge with a fair degree of certainty, whether the decedent comprehended the meaning of the provisions of the two instruments, and was satisfied with them.

There is no dispute that the decedent was an illiterate man, in so far that he could not read, except figures, and could not write more than his name. Hence, all the instructions as to the preparation of the papers, and the declarations at the time of the alleged execution of the same being his will and codicil, and the requests to the subscribing witnesses to sign as such, if such declarations and requests were made, must have come from him either orally or, in the absence of express language on his part, must have been made by some method known to those who were present on the three occasions.

It is first important to consider, in this connection, whether these papers propounded for probate were prepared by the draftsman in accordance with any instructions of the decedent. The testimony of Mr. Bellesheim is, that Henry Herrmann, a few days before the alleged execution of the will, came to his office and told him that the decedent wished to see him. He did not go at once, in response to the request, and Herrmann made another call upon him and asked him why he had not come, as the decedent expected him. The following day he went, in the morning, and found Mrs. Rollwagen present. The decedent was sitting in an arm-chair, and was very feeble, and could not move. Mr. Bellesheim asked what was wanted of him, but the decedent made no reply. Then, after Mrs. Rollwagen addressed the decedent, and inquired what he

wanted of Mr. Bellesheim, he made an obscure sound, unintelligible to Bellesheim, upon which Mrs. Rollwagen went into the adjoining room, brought forth an envelope containing a paper, which proved to be a will previously executed by the decedent, and known in this proceeding as the "Rosenstein will," and she stated that the decedent desired to have a new will made, in which the new house just purchased should be devised to her instead of the old house, which had just been sold, and which had been given to her in the Rosenstein will; also that the name of Henry Herrmann should be substituted as executor in the place of Mr. Beers, who had been named in the Rosenstein will; and that, in other respects, the dispositions under the Rosenstein will should be incorporated in the new instrument. Mr. Bellesheim repeated to the decedent the instructions which Mrs. Rollwagen had given, to know if they were his desires, and, in response, the decedent made the same obscure nasal sound, from which he inferred that the directions she had given him were correct.

Then, as to the preparation of the codicil, it appears by the testimony of Mr. Bellesheim that Henry Herrmann again called upon him, some time before its alleged execution, with a similar statement, that Mr. Rollwagen desired to see him. The matter escaping Mr. Bellesheim's memory, Herrmann came again and repeated the request, and Mr. Bellesheim went accordingly to the decedent's house, and was taken into his presence. After waiting for some time, with a confessed inability to communicate with him at all, and a statement made by him to Mrs. Rollwagen's mother, in the presence of the decedent, that he could not understand him, Mrs. Rollwagen came into the room and stated to Bellesheim that the decedent desired to make an alteration in his will; that he wanted her to get four houses in Avenue A, and in case she should get a child by him the estate should go in even shares or equal shares with the other children. She subsequently gave Mr. Bellesheim the numbers of the houses referred to, and he took the precaution to show the memorandum thereof in writing to the decedent,

In the Matter of Rollwagen.

·who did not say anything, and could not say anything, but he nodded the same as before.

It thus appears that, so far as the preparation of the will and codicil is concerned, there was no expression, either by words or sounds, proceeding originally from the decedent, by which his wishes were stated in regard thereto; and if any directions were given by the decedent at all, they are only to be inferred from the representations made by his wife, and from his assumed assent thereto. It is not claimed that he assented by the use of any spoken word or words, but only by the obscure sound already referred to, and by a nod of the head. Nor is there satisfactory evidence of any manifestations by the decedent that his mind was in a condition to comprehend the scope and bearing of the directions, if given at all.

The testimony of Mr. Bellesheim (who, it is fair to infer from all the circumstances in the case, was retained by Mrs. Rollwagen and Henry Herrmann, her brother) is, therefore, conclusive to my mind as to the fact that the decedent had no power of expressing his wishes in vocal or articulate language at the time the directions were given for the preparation of the will; and, in this respect, his testimony as to the physical condition of the decedent is confirmatory of that of Dr. Tully, who testified that the same condition must have existed for a long time before he was called to attend upon him in his capacity as physician. That these supposed instructions were entirely satisfactory to Mrs. Rollwagen, there cannot be any question. Whether they were satisfactory to the decedent is a question of the gravest doubt, even admitting that he had the mental capacity to comprehend them — for the reason that he had no power of utterance, and no means of communicating his wishes, proceeding originally from himself. Mr. Bellesheim inferred that they were satisfactory to the deceased because he seemed to acquiesce in them.

Dr. Goulden, another subscribing witness, admits that, prior to the execution of either paper, no request was ever

made to him by the decedent, directly, that he should become a witness thereto. All the requests came directly from Mrs. Rollwagen.

In respect to the execution of the papers propounded, does the testimony of the subscribing witnesses show that any form of expression was used by the decedent to indicate that he comprehended their nature or import?

It appears from the statements of Mr. Bellesheim that all the forms prescribed by the statute for the due execution of testamentary instruments were complied with at the time of the alleged execution of both papers, so far as the *recitation* of them by Bellesheim was concerned. But his testimony is direct to the point that no word or words were uttered by the decedent, from which more than an inference may be drawn, that he understood the nature of the proceeding that was going on. On the contrary, in each case, questions were asked at each successive step, by Mr. Bellesheim, in their proper order, and the decedent made the same obscure nasal sound, previously referred to, from which, Mr. Bellesheim states, he inferred the *assent* of the decedent to the alleged execution.

Nor, do I find in the testimony of ·Dr. Goulden any evidence that there was any declaration on the part of the decedent as to the paper being his last will and testament, though I have examined his testimony most carefully, both on his direct ·and cross-examinations.

And in respect to the execution of the codicil, the testimony of both witnesses is entirely unsatisfactory as to any declaration or request on the part of the decedent; and, if made at all, they are simply to be inferred from language addressed to the decedent, and from nods, and the utterance of obscure sounds, claimed to be in response.

The testimony of Theisz, the third subscribing witness, differs from that of the other two, in the fact that it proves too much as to the capacity of the decedent to converse audibly, or too little on the part of Bellesheim and Goulden to under-

In the Matter of Rollwagen.

stand him. Each of these three witnesses was examined when his associates were, by direction of the court, excluded from the court room. The contradiction between Bellesheim and Goulden, on the one side, and Theisz on the other, can only be reconciled, if at all, by the fact, as claimed by the proponents, that the two were not as near the decedent as was Theisz, and, therefore, they were not as good judges of the capacity of his speech. But I am convinced, in view of all the evidence in reference to the execution, that the claim that Theisz had any advantage of position over the other witnesses has no sufficient foundation. Dr. Goulden was not by any means a hostile witness, but, on the contrary, by reason of his being a compatriot of Mrs. Rollwagen and her brothers, and her physician, was most friendly to them ; and his testimony directly contradicts that of Theisz. In addition to that, so far as hearing the articulate whispered utterances of the decedent is concerned — if such utterances were made, as testified to by Theisz — Mr. Rollwagen also being a native of Alsace, Dr. Goulden would be more apt to fully understand the *patois* of the decedent, which, Bellesheim, as well as Theisz himself, states, was used by him in speaking the German language. But Dr. Goulden failed to hear anything but the obscure sounds already described. If Theisz's testimony is to be believed, then, not only was the decedent possessed of full testamentary capacity, but was possessed of very good powers of speech, for an invalid who had been suffering for a long period from paralysis.

I have thus considered the testimony of the professional witnesses who have been examined in the case, and also that of the subscribing witnesses to the will, in reference to the ability of the decedent to express his ideas and wishes directly by speech.

But there were a large number of witnesses called by each party to the proceeding, for the purpose of proving the capacity or incapacity of the decedent to communicate his ideas through the medium of spoken language. Some were mechan-

ics, employed on buildings he was altering or erecting; some were visitors to his house; some were friends and relatives of the Rollwagen family, and others friends and relatives of the Herrmanns. Though these statements of the witnesses called by the two parties, respectively, are more or less diverse and contradictory; yet, from a careful examination of all the proofs bearing on this point, I am constrained to believe that the decedent, for many months previous to the execution of the papers propounded as the last will and codicil, did not have the power of communicating his thoughts by spoken words; and that the weight of evidence sustains the opinion expressed by Dr. Tully, to wit: that the decedent had suffered from paralysis for a long time, and that his inability to speak was mainly the result of his paralyzed condition. If, at the best, their testimony leaves the question in doubt as to his ability to express his ideas in speech before and after the execution of each of the instruments offered, I must be governed primarily by the undisputed evidence of Mr. Bellesheim, that he did not possess the power of speech at the time the alleged directions were given for the preparation of the will and codicil; and also the great preponderance of proof of Mr. Bellesheim and Dr. Goulden, that, at the time of the execution of each instrument, he was under the same disability; and certainly, each, in the desire to sustain the cause of the proponents, could not have failed to have discovered in the decedent the ability to express his wishes, as testified to by Theisz, if such power, in point of fact, existed.

There were four witnesses examined by the proponents, whose testimony proves a capacity of speech by the decedent even greater than was testified to by the attesting witness Theisz. I refer to Mrs. Henrietta Perry, her son Fred. C. Perry, Mrs. Amelia Schmoll and Mrs. Martha Miller. These witnesses represent a class by themselves. They are not like those who profess to have had business transactions with the decedent, but are the friends of Mrs. Rollwagen.

Many years before her marriage, and soon after her arrival

In the Matter of Rollwagen.

in this country, Mrs. Rollwagen, then Magdalena Herrmann, was a domestic in the house of Mrs. Perry; and shortly before Magdalena's marriage to the decedent, Mrs. Perry called upon her at the old house in Ninth street. Mrs. Perry's testimony as to the decedent's capacity of speech was to the effect that, in 1873, he said to her that his son Frederick came there and wanted him to give him a power of attorney; that they wanted to make a fool of him; and that then, when he wanted money, he would have to ask them for it. She repeated various conversations which, she alleges, she had with the decedent, and stated, in general terms, that she had never any difficulty in understanding him.

I am constrained, in view of all the facts and circumstances proven, to regard the statements of Mrs. Perry as incorrect and unreliable when compared with the testimony of other witnesses for the proponents, to which I must give credence, especially that of Mr. Bellesheim and Dr. Goulden. They do not pretend that the decedent was able to utter more than an obscure inarticulate sound at the time of the execution of the will, which was in the month of June, the same month when, according to the testimony of Mrs. Perry, he uttered the long sentence above quoted.

Mrs. Martha Miller, who had for many years been employed in the family of the decedent to do washing and house cleaning, and who is at present in the employment of his widow, testified that in the month of June, 1873, the decedent told her that "he had fixed a boy," and also told her that "he wished to live so long as he could see the baby — a couple of years longer." She also testified to many declarations and remarks made by the decedent during the last two years; but on her cross-examination, she made statements which compel me utterly to discredit her testimony. She stated that she had never communicated to any person a knowledge of the facts which she could prove, and she reiterated the statement time after time; and yet it was evident that counsel could not

have elicited those facts unless she had given the information of her knowledge in that regard.

Mrs. Amelia Schmoll, an old friend of Mrs. Rollwagen for ten years, testified that she saw the decedent as late as September 24, 1873, and that on that day she heard the decedent say to his son Frederick, "You write and tell George to stay." About the same time, she states that Frederick asked his father at dinner, what part of the chicken he would have, and the decedent said "breast;" that in August, 1873, which was the period between the execution of the will and codicil, the decedent said: "If Lena dies, what will I do? I will have to go to the hospital;" that she reminded him that he might go to his son's, and he replied, "I did twice, but never more." She further testified that on leaving one day, he said, "Lena, go get some wine;" and that he drank the same as any other man would, she supposes, using his right hand. In reference to the statements which Mrs. Schmoll makes of the words spoken by the decedent in the presence of Frederick Rollwagen the son, she was fully contradicted by Frederick, who states that he never, during the last year of his father's life, heard him utter anything which he could understand. And in passing I may observe that the striking uniformity with which a large number of the witnesses for the proponents testified to Mrs. Rollwagen's interpreting the inarticulate sounds spoken by the decedent as calls by him for wine, indicates, in my view, not so much the presence of intelligence and mind in the decedent, as that he was influenced by the force of a ruling passion and habit which his wife was only too willing to gratify. Mrs. Schmoll also testified that in September, 1873, the decedent said, in a clear tone, "I feel bad, and I think I am going to die;" and that she cheered him by talking of the little Rollwagen that was "coming to town," the prospective christening, and that she and the decedent, on that occasion, would dance in the parlor; and that the decedent then laughed "until the tears ran down his cheeks." She further stated that she could not recollect

whether Mrs. Rollwagen did not tell her what she claims the decedent said, except on one occasion, when he used words in German, which she did not at once understand; and she also testified that she never had the slightest difficulty in understanding everything the decedent said.

In respect to the alleged conversation testified to by Mrs. Schmoll about the coming Rollwagen, the time is fixed to have been on the twenty-fourth of September — the day when Dr. Tully was called in as the attending physician; and he states that the decedent was at the time in a stupor, from which he had to arouse him, and he then was unable to elicit from him a single word or articulate sound, and further, if the decedent had the strength, by reason of paralysis of his tongue, he could not have articulated. To my mind, it is only necessary to refer to the clear and intelligent testimony of that gentleman to arrive at a proper estimate of the credit to be accorded to the remarkable statements of Mrs. Schmoll. There is, however, one salient feature of her testimony, which is confirmed by several of the witnesses on the part of the proponents, and which is, in substance, that the decedent frequently shed tears. This exhibition of emotion is often observed in persons suffering from paralysis.

A striking commentary upon the evidence of these three witnesses is furnished by Henry Herrmann, the proponent himself. He admits that he had a difficulty in understanding the decedent as early as the fall or summer of 1872; that after June, 1873, on some days, he could not understand him; he sometimes understood him; that Mrs. Rollwagen began to interpret in the fall or summer of 1872; that she generally interpreted about half of what the decedent said to him, and he had heard her interpret to others.

Samuel S. Browning, another grandson of the deceased, testified that, as early as May, 1872, Henry Herrmann told him that he did not like to go to Mr. Rollwagen's, because he could not understand anything he said, and that "he got very mad and kind of cried."

In the Matter of Rollwagen.

Fred. C. Perry, a sophomore student in Dartmouth college, and a son of Mrs. Perry, testified that, in February, 1873, he called on the decedent with his mother, and that the decedent shook hands with him and said "How do you do?" that the decedent asked him about his college course, and what year of the college course he was in, and how he liked the place, and how many students were there, &c., &c. He testified, also, that he told the decedent what Latin books he was reading. The testimony of this witness does not come down to a later period than four months previous to the alleged execution of the will. I should judge that the classical references of the witness, addressed to an ignorant butcher, who could neither read English nor German, the only languages with which he was familiar, were about as intelligible to him as references would have been to propositions in the higher mathematics, or the abstractions of mental philosophy. It is characteristic of young collegians to imagine that they belong to a chosen, select and favored class, and I should judge from the testimony of young Perry, and from his appearance, that he was himself much more interested in the details of his college life than was the decedent, provided the latter had intelligence enough even to listen to what must have been, in his condition of life, at best, most obscure to his comprehension, and that probably the witness accorded to the nods and motions of the decedent a much greater understanding of his voluble narrative of collegiate experience than the decedent really manifested.

I deem it unnecessary to review further the testimony of those witnesses who represent the decedent, at or about the time of the execution of the codicil, as having uttered words which were intelligible to those present. Their testimony, taken most favorably, is a struggle to prove only the slightest articulation, and is, of itself, an implied admission that he was a speechless man, so far as any conversation could be had with him; a struggle to lay a foundation for the claim that he was not the utterly speechless and helpless old man that

In the Matter of Rollwagen.

he is shown to have been by the testimony of two of the attesting witnesses to the will and codicil, and by that of a majority of the witnesses who had business transactions with him.

Being forced, irresistibly, to the conclusion that the incapacity of the decedent to communicate his wishes has been established by the evidence, and especially at the time the directions were given for the preparation of the will, and at the time of its execution; and that the party assuming to communicate between him and the attorney who prepared the instrument, was, in each case, the widow, who is to be so much benefited by its provisions, and her brother, who is himself made the agent and manager of the estate for many years to come under its provisions, I regard it as extremely dangerous, in a judicial determination, to accept the presumed assent by a nod, or the assumed communication of wishes by obscure, inarticulate sounds, known only, if at all, by the widow, who is so largely interested in the result. And of the correctness of this view I am the more convinced, when it is shown by some of the witnesses for the proponents, if they are to be credited, that the decedent, before and after the execution of both will and codicil, intelligibly spoke entire sentences; for, if this were so in fact, it is almost incredible, as it seems to me, that, on a day when it was found he was able to communicate his wishes directly, measures should not have been taken to have the scrivener present to receive the directions from the decedent's own lips, and that they should not have selected a similar occasion for the execution of the instruments, when the decedent could have published and declared them to be his will and codicil, and have requested the attesting witnesses to subscribe their names thereto, by his own words, and not by an implied assent given by a nod or an inarticulate sound.

It is doubtless true, that where a will is prepared and executed under circumstances which do not admit of a suspicion of fraud or undue influence; or where the relations of

the parties are such as would make the proposed disposition evidently equitable and natural; or where such disposition is in accordance with the well-known previously expressed wishes of a testator; and, further, where no doubt exists as to his testamentary capacity — the law will accept as the expressed assent to the provisions of an instrument on the part of the testator, a nod or any other means which may reasonably be presumed to intelligibly show his wishes. But the present case is not surrounded by such favorable circumstances as, in my opinion, will admit of any such presumption.

The papers propounded are, to my mind, rather the creations of the widow and her brother, Henry Herrmann, than of the decedent.

Being so well satisfied that the proofs show an inability on the part of the decedent to communicate his testamentary wishes, or otherwise to give directions for the preparation of a will in accordance with his purposes, even if he possessed testamentary capacity, I shall not consider fully, as I otherwise would, the question of whether the decedent was, at the time of the execution of the papers, imbecile. He was certainly in a deplorable physical condition — so helpless that he could not walk without assistance, was even unable to control the calls of nature, was suffering under a deprivation of the power of speech, and was under such disabilities that he was wholly subject to the influence, correct or sinister, of those who surrounded him, and who alone ministered to his physical wants. For, it must be remembered, that his sons, all of whom were married, and did not reside with their father as appears by the evidence, were scarcely ever, if at all, allowed to be alone with him; and, the only inmates of his house were his wife, her brother and her mother, all of whom were interested, directly or indirectly, in procuring from the decedent the execution of such testamentary instruments as are propounded.

There may be undue influence without absolute imbecility or other testamentary incapacity. A person may possess

some mind, and yet be at the mercy of designing persons. The decedent being in an entirely helpless condition, he was, in my judgment, if not the unconscious, at least the submissively weak instrument of the will of his wife and her brother. Whether he had the mental capacity to comprehend what was exacted of him, there are no means of certain knowledge. Whether he was in a position or possessed capability to resist the influence of those surrounding him is, to my mind, more than doubtful; and to arrive at a probable knowledge of whether he possessed the capacity to transact any business, is to be found in the testimony, and also in the acts of his wife and her brother, Henry Herrmann.

It is urged, on their part, that the decedent engaged in business transactions during the last years of his life, that imported the existence of sufficient mental capacity to make a will.

Mr. Geissenhainer testified that he was called to the decedent's house in March or April, 1873, where a conversation was had in reference to a notice served upon him to shore up his house, on account of an excavation for a new building to be erected adjoining ; but it appears that the whole conversation was carried on by Mrs. Rollwagen.

Bernhardt Schaaf and Charles Schwartz, the mechanics employed in the erection of the new building which the decedent was putting up, testified to facts connected with their obtaining their respective contracts. Whatever their inferences may have been, in respect to the acts of the decedent being the result of his own volition, their is an utter failure of proof of language used by him to show that he comprehended the business.

William Challier repaired the new house in May, 1873, but he stated that he received all his orders from Mrs. Rollwagen, and that she paid him his bill.

James Striker testified to the visit of the decedent, with his wife and her brother Henry Herrmann, to the Murray Hill Bank, in 1873, when the arrangement was made for the pay-

ment of the check for the purchase-money of the new house. In that case there was no word spoken by the decedent, but Mrs. Rollwagen assumed to interpret what her husband said.

Henry Werner, a painter, who made an estimate for the painting of the new house, saw the deced nt in May, 1873, but he states that the whole conversation was carried on with Mrs. Rollwagen and Louis Rollwagen, in the presence of the decedent, there being no proof that he spoke any words on the occasion.

William H. Sackett testified in reference to the interview resulting in the sale by him, to the decedent, of the new house ; but, in this instance also, there were no utterances by the decedent, which he could understand, the conversation, on his behalf, being conducted wholly by Mrs. Rollwagen or Henry Herrmann.

Of the testimony produced by the proponents, William Finkernagel testified to visiting the decedent in July, 1873, about doing some repairing on a house in Fourteenth street, on which occasion the decedent said, " How do you do ? " and " Sit down ; " and said, in reference to a little child the witness had with him, " That is your girl ? " " She will get big ; " " Henry tells you what to do in Fourteenth street ; " " Do it right," and " Call again, William."

Joseph Foerster, who did the roofing work in the new building erected by the decedent, had an interview with him in August, 1873, but the decedent spoke no word, except " money."

Christopher Bendinger called on the decedent in May, 1873, for the payment of a wine bill, and Mrs. Rollwagen paid him the amount.

John C. Hoch testified that, in April, 1873, the decedent told him that he proposed to build a house, on the corner of Stanton and Essex streets ; that he had plans made by an architect named Beers ; that he did not like the plans, and would not have anything to do with them ; and asked him, the witness, for a good architect he was acquainted with.

He stated also, that the decedent, in April, 1873, said that Beers, his old agent, owed him for rents, but that there was no use of crying over spilled milk. In the same year, he stated that the decedent spoke to him about the trouble he had about getting teams, and he wanted the witness to recommend some one. He testified that he understood most of the decedent's words, but once in a while, if he did not know what he said, Mrs. Rollwagen would tell him. The witness introduced Boekel, the architect, whose services were engaged, and recommended that Boekel be employed also to superintend the erection of the building. In April, he understood pretty much all the decedent said, without any motions, but in September he could not understand him.

Ernest Ohl testified, in reference to the negotiation of the sale by the decedent to him of the old house, in May, 1873, that the decedent spoke in a kind of a way, but he did not understand him, only a few words. Mrs. Rollwagen was present when the deed was signed, and she assisted the decedent to write his signature.

George Smith, who did the painting of the new house, states that he called on the decedent in April, 1873, and saw him in bed; that decedent said to him, " You nearly lost the job; I want you;" that he asked the decedent to give him a chance to estimate on it, and the decedent said, "All right;" that the next morning he estimated at $880, and the decedent said, "That is too much, 875;" that he told him he would take $875, and the decedent said "Go on;" that when he passed the decedent, at the new house, he said to the witness, " How you get along up there?" and he called, "Lena, some wine." He presented his bill to the decedent, who said " Lena." He had the keys lying in his bed, and she took them out and went and got the money, counted it to the decedent on the bed, and he said " Take it." In June, 1873, he again saw him about painting, and asked the decedent a dollar a room. The decedent said, " No, I want all the

money to build a new house." Henry Herrmann said, " Who is lowest, gets it."

Julius Boekel, the architect, testified to various conversations with the decedent in May and subsequent months, as late as August, respecting the preparation of plans for a new building, the exhibition of the plans, the giving out of the specifications to the mechanics, the execution of the contracts with them, and some other matters, in some of which, he states that the decedent distinctly enunciated words and sentences, which he understood perfectly, and, at other times, Mrs. Rollwagen and Henry Herrmann interpreted what they claimed he said.

In regard to the witnesses from whose testimony the proponents infer that the decedent had the capacity to transact business, though some of them speak positively of words and sentences that were uttered by him, I am of the opinion, in view of the weight of proof, that they are mistaken in their recollection. It is a matter of common experience in the legal profession that witnesses, not charging their minds with the details of a conversation or the order in which it transpired, when their attention is called, months afterward, to what was said, are apt to put their conclusions in the form of a dialogue as occurring between themselves and another, or between others in their presence, sustaining such conclusions. In this case the parties having business transactions with the decedent assumed that he possessed the capacity to make a contract. What they were seeking was to have their own rights and interests properly guarded and protected, and provided that was accomplished, they had no interest in the manner in which the end was attained. Hence, whether the inarticulate sounds made by the decedent in response to questions by his wife or Henry Herrmann were understood or correctly interpreted by them, or whether he actually spoke the words imputed (they never expecting a controversy to arise which would make the fact important), the fact that he did not speak, but only uttered indistinct monosyllables,

would be more apt to impress itself upon one's memory than that he did speak. The inability to speak by a contracting party is unusual in conducting business operations, while speech is the ordinary medium through which negotiations are conducted. Therefore, I place more reliance upon the testimony of those who remember that the decedent was speechless, than I do upon those who have a shadowy recollection of the utterance by him of words or sentences. And a significant fact, proven by the testimony, is, that in all of these business interviews Henry Herrmann or Mrs. Rollwagen, or both, were present, and in nearly every case the evidence shows that one or the other assumed to interpret the sounds uttered by decedent.

The testimony of Henry Herrmann on his cross-examina·tion, is to my mind very important, in confirmation of the view that the decedent had not the capacity, about the period of the execution, of these papers, to perform any acts of business.

Four of the checks, to wit : one dated August 12, 1873, to the order of Bernhardt Schaaf, for $7,000 (Schaaf being the party who did the mason work on the building which the decedent was erecting); one dated October seventh, and payable to Schwartz & Lehmann, for $2,300 (they being the parties who performed the carpenter work on the same building); one dated October tenth, to the order of Joseph Foerster, for $2,200 (Foerster being the party who did the roofing work on the same building); and one dated October tenth, payable to the order of the receiver of taxes, for $3,975, for the amount of taxes due upon the property of the decedent; all of which checks were drawn upon the Butchers & Drovers' Bank, were presented and paid at the bank, and, as appears by the evidence, the signature "F. Rollwagen" was written by the wife of the decedent, and the signature in each case, in a marked degree, resembles his genuine signature. If the decedent was competent to execute a will and codicil, and to sign with his own hand his name to each of the instruments, and to sign the

check for the purchase-money of the new house, as testified to by Henry Herrmann, why was he not competent to affix his signature to the four checks named? The fact that he did not sign those checks, which is admitted by Henry Herrmann, is very important as bearing on the issues involved in the proceeding. It raises, to some extent, the presumption or suspicion which has been presented by the contestants, that the same hand that signed to those four checks the name " F. Rollwagen," which were paid to the contractors who constructed the building of the decedent, and paid the taxes upon his property, may have written the signature to the will and codicil; for the hand which signed those checks without authority (unless the testimony of Henry Herrmann is to be credited on the point), was the hand of the person who is the principal beneficiary under the papers propounded.

The paper offered as a will was signed on the seventeenth day of June, and the deed transferring the old house in Ninth street to Ohl was signed on the fourteenth of June. The contract for the purchase of the new house in Ninth street was signed on the seventeenth of April. On all of these occasions, Mrs. Rollwagen held the hand of the decedent when his name was signed, as testified to by Ohl and Sackett respectively. Bellesheim, when asked about this matter, stated that he did not notice the fact as testified to by those witnesses. He also stated that he did not see Mr. and Mrs. Rollwagen between the time he received the instructions and the time the will was drawn. The instructions must have been received, according to his own testimony, about eight days before the will was executed, which would fix the time at about the ninth of June, whereas he was present and saw the deed executed only three days before the will was executed, on which day both the decedent and his wife were present. Then, it is further shown that the contracts with Schaaf and Schwartz & Lehmann, for work done upon the building, were signed, upon the assumed authority of the decedent, by Henry Herrmann. In fine, there is no proof of any signature having been written by the

In the Matter of Rollwagen.

decedent himself to any paper, except the will and codicil, unassisted, except on the 1st day of May, 1873; and the only proof as to that is by Henry Herrmann, who testified that Mr. Rollwagen signed in his presence the check for $17,200, for the balance of purchase-money for the new house. It is singular, therefore, that the power to write his name by the decedent should have revived only for the purpose of signing a will and codicil; and a very strong presumption necessarily arises that he did not write his name to either instrument unassisted. Theisz testified positively that the decedent did write his name unaided, while Bellesheim, more cautious, on cross-examination, stated that he was uncertain, and he would not swear either way. Although Bellesheim was the draftsman of the will, and selected by Henry Herrmann and his sister, as I am constrained to believe, and certainly paid by her for his services on each occasion, yet there was a cautious disposition evinced by him as to this part of the transaction, and in fact as to the whole proceeding. Dr. Goulden testified, on his cross-examination, in respect to the execution of the codicil, that he did not remember at all whether he saw any one hold the pen, nor did he remember whether any one did hold it. This testimony is very obscure and unsatisfactory, as to the unassisted use of the pen by the decedent, and especially so when considered in connection with the undoubted fact (leaving out of consideration the testimony of Henry Herrmann as to the check signed the 1st of May, 1873, for $17,200), that during the last year of his life the decedent is not shown to have signed his name to a single paper, except the will and codicil, unassisted. Another remarkable fact bearing upon the capacity of the decedent to write his name to the papers propounded is, that four days after the alleged signing of the will he was unable, according to the testimony of Boekel, the architect, to sign the contract with Schwartz, the builder. His name was signed by Henry Herrmann, under the assumed verbal authority of the decedent although the document was under seal.

In view of the physical inability of the decedent to sign his name, as established by the proofs of so many witnesses, and of the fact that either his hand was guided by his wife, or else that Henry Herrmann actually signed the decedent's name under alleged verbal authority, I am compelled to come to the conclusion that the testimony of an· actual subscription of the will and codicil by the decedent himself is very unsatisfactory.

And further, in reference to the capacity of the decedent to conduct business, the testimony as to the interview that occurred at the Butchers and Drovers' Bank — in September, according to the statement of the bank officers, and in June, as stated in the testimony of Henry Herrmann — confirms the belief that the decedent was in a most enfeebled condition at or about the time of the alleged execution of the papers propounded as the will and codicil, and, to my mind, strongly supports the testimony of Dr. Tully as to the disease under which the decedent labored, and as to his state of utter physical helplessness.

It has been claimed by the proponents that undue influence cannot be implied in this case, as exercised by the wife of the decedent; the influence being such as arises from "affection, gratitude, or love;" and that such feelings were entertained by decedent to his wife. The recognition of that kind of influence as an exception to any general rule on the subject, must depend, in its application, upon the facts and peculiar features of the case in question. It is not, it is true, unusual for a testator to bequeath all or the bulk of his property to his widow, where there are minor children, who need not only the nurture and protection of the mother, but may be placed in a state of dependence upon her, so that they may be free from the wiles and intrigues of interested parties. This is not, however, one of the cases in which · parties have lived together during a long life of wedded happiness, and have reared children, so that the interests of each have become as those of one person by a long perfected union.

In the Matter of Rollwagen.

Nor is it of a class in which the husband was under such extreme obligations that it would be only natural to make an exception in favor of the widow greatly disproportionate to the shares of his children by a former wife. The children of the decedent were the issue of his early marriage, and all of whom, with the exception of the grandchildren, had reached the estate of manhood. The peculiar obligations in this case certainly appear to have been almost entirely on the part of the widow to the decedent. It is true that she, during their short wedded life, ministered to his wants, lifted him to and from the bed, and even fed him with a spoon on account of his helpless condition, and bestowed other like attention. But it is not probable she married him through any great love; for it is scarcely supposable that such a sentiment could be awakened in the heart of a woman for this helpless, paralyzed man, whose speech, even at the day of the marriage, I am compelled to believe, was much impaired. Passion could scarcely have had any part with her in consenting to such a union. There could have been but few charms in his society, as he is depicted to us in the best light by even the witnesses for the proponents. It must, it seems to me, have been a marriage of interest on her part, for it elevated her from a position as a hired domestic, at fourteen dollars per month, to be the mistress of a large house, to the management of her husband's estate by her brother, to the probable control of his rents and income, and finally, to the purchase of a more elegant establishment, over which she presided at the time of his death, and in which her brother and mother became inmates, and who subsisted on the income of the decedent. For all this elevation, the enjoyment of his estate, and a certainty of at least a dower right in his realty at his death, which would be wealth to her in comparison to her former circumstances, living upon monthly wages, she, without doubt, faithfully returned the ministrations of a nurse. But her attentions could hardly have sprung, in any degree, from that affection which char-

acterizes marriages in general, nor have been of the kind that result from a long continued and habitual intercourse, originating in love, in youth or early manhood and womanhood. I cannot resist the conclusion, from all the circumstances proven in the case, that the motive or feeling which prompted her devotion to him, did not arise either from passion or the sentiment of affection; and that its explanation may be very reasonably sought for in self-interest and design, which, in the weakness of the testator, rendered him an easy subject to the personal will and wishes of herself and brother.

Undue influence is a relative term, depending on the relation of the parties concerned to each other; their comparative ages, their temperaments, intelligence, education and habits; their physical, mental and moral health and strength, the attending and sometimes remote facts and circumstances; and, again, in all cases, more or less, on the existence and adequacy of motive for the undue influence.

Take the decedent as he was presented under the most favorable aspect by the witnesses for the proponents, and he must readily, if not powerlessly, have yielded to the undue influence of those who surrounded him when so disabled in hand and speech. Assuming that he possessed some mind, and that its emanations were exhibited in some of his actions, yet his condition must still have left him easily subservient to the will of those in the advantageous position of the wife and her brother to influence him in their own favor. Undue influence involves the idea of testamentary capacity, and the term cannot be deemed, in law, to apply to a person whose mind is gone, for it presupposes some mental power, however feeble. It supposes the presence of a stronger and healthier mind in immediate proximity with another mind enfeebled by disease, decay, or other cause, and a conscious advantage taken by one over the other.

This case furnishes, as it appears to me, one of the strongest instances I have known of the exercise of undue influence. It seems to me, indeed, that the proponents' own

evidence proves the use of such influence. An old man of sixty-six, utterly illiterate, twice a widower, enfeebled by disease for many years, while suffering from paralysis, marries his housekeeper, who has been satisfied to accept small wages for her services. With three adult sons, the children of the companion of his early marriage, and seven grandchildren, the issue of his daughter, all of whom were kind and affectionate to the decedent; yet not one, as appears by the undisputed testimony, was permitted to hold intercourse with him except in the presence of their stepmother, or some one in her interest, even though they came to speak kindly words which might be a comfort to him whose condition seemed to render his life so precarious.

So, the houskeeper of the Rollwagen household had become its mistress. The employe for monthly wages, who had never, until the helplessness of the decedent, so far as appears, been sought after as a wife, had become the wife of a sick and helpless old man, whose days were apparently almost numbered. Her future independence was assured during the life of her husband, and her dower right in his estate would, at his decease, give her, for the residue of her own life, a large annual income. But the house in which the decedent had resided for several years, and in which she, as Magdalena Herrmann, had been satisfied to reside as an employe, and afterward as a wife of the decedent, as shown by the evidence, became unsatisfactory to her; or for some other reason a change was desired, which resulted in its sale, and the purchase of a superior dwelling. In April, 1873, when the deceased was in the helpless condition already described, his old agent, Mr. Beers, was discharged, and Henry Herrmann, the brother of Mrs. Rollwagen, was put in his place. This was only about two months before the execution of the alleged will. George, the youngest son of the decedent, having gone to California, the only residents of this house were the decedent, his wife, her brother Henry, her mother, and a domestic of whom the mother of Mrs. Roll-

wagen was godmother. None of those related to the decedent by ties of blood were there. The family of the Herrmanns had, by this time, become the controllers of the Rollwagen household, and the Herrmanns were to the Rollwagens as *familia in familiâ.* Considering the prostrate, feeble and paralyzed condition of the decedent, and his speechlessness, which upon the whole of the testimony, I am bound to believe, he was inevitably subject to the influence of those who had established themselves as a family within his household. If he was not the victim of their influence, the creature of their will, and the pliant instrument of their plans, they must, considering the tenor of the provisions of the will, take the responsibility. They must rest under the natural suspicion which is cast upon them from the facts; and if the provisions contained in the two papers expressed the real wishes of the decedent, it is most unfortunate that the proponents were not provided with testimony to that effect. The widow was not called as a witness in the case. It is true that it would not have been competent for her to testify to any transaction or communication between herself and her husband. In this connection the language of judge PORTER, in the case of *Tyler* agt. *Gardiner* (35 *N. Y. Rep., page* 692), is very appropriate to the peculiar features of this case:

"When the principal beneficiary under a will prepared for execution by a party worn down by disease, and close upon the verge of death, assumes the responsibility of initiating it, of preparing formal instructions, of employing the draftsman, of selecting the witnesses, of being present at every stage of the proceeding, and of excluding those to whose inheritance a new direction is given, it behooves such beneficiary to be provided with evidence that the instrument expresses the honest and spontaneous purposes of the person who is called upon at such a time to reverse the provisions of a previous testamentary disposition, made in health and strength, in favor of those having clear claims upon the justice and bounty of the testator."

In the Matter of Rollwagen.

In this case there is entire absence of such proof in the testimony of Bellesheim, unless we accept the assumed interpretation of sounds, by Mrs. Rollwagen, the meaning of which he was himself entirely ignorant. Magdalena Rollwagen, the principal beneficiary, and her brother Henry (who must be considered under the papers in question as a beneficiary for a long period) possessed the advantage of opportunity and time for the purpose of exercising influence over the mind of the decedent, and there was no opportunity for persons opposed to their plans to counteract them.

The fraud and undue influence which may be exercised over the mind of a testator, may not be at all visible or known to the subscribing witnesses at the time of the execution, but must almost necessarily have occurred previously, the execution being the result of it. To quote further the language of judge PORTER:

"It is not to be supposed that fraud and undue influence are ordinarily susceptible of direct proof. Subscribing witnesses are called to attest the execution of wills, but not the antecedent agencies by which they are procured. The purposes to be served are such as court privacy rather than publicity. In some cases, as this court said in the case of *Sears* agt. *Shafer*, 'undue influence will be inferred from the nature of the transaction alone; in others, from the nature of the transaction and the exercise of occasional or habitual influences. The grounds for imputing it, as sir JOHN NICOLL said in the case of *Marsh* agt. *Tyrrell*, must be looked for in the conduct of the parties' and in the document, rather than in the oral evidence. The necessary inferences to be drawn from that conduct will afford a solid and safe basis for the judgment of the court. Where the oral evidence harmonizes with those inferences, a moral conviction rightfully follows; but the depositions, where they are at variance with the conduct of the parties and with the *res gestæ*, are less to be relied upon.'"

It is a remarkable fact that in the preparation of the will by Bellesheim, under the instruction of Mrs. Rollwagen,

In the Matter of Rollwagen.

which must not be lost sight of, she stated to him that her husband desired to make a new will as amendatory of some of the features of what is known as the "Rosenstein will;" and she handed the Rosenstein will to him to be used as the draft for that purpose, and he returned it subsequently to her. The fact that she had not produced it in this controversy being unexplained, may well be regarded with some suspicion.

I feel constrained to come to the conclusion, from the position occupied by Henry Herrmann to the decedent, and from the provisions in the will for his benefit, under which he is, for a long period of time, to be the agent for the management of the estate and is to receive three per cent of the moneys which he collects, and in regard to which there is no testimony of the intentions of the decedent, as expressed by himself directly, either as declarations or instructions to anybody, that he, equally with his sister, was a principal actor in the scheme to obtain, through circumvention, fraud and undue influence (provided the decedent had testable capacity), both the will and the codicil. The case of *Tyler* agt. *Gardiner* (35 *N. Y. Rep.*), applies with such appropriateness to the peculiar features of this case, that it is not necessary, in my judgment, to refer to other authorities to support me in rejecting the papers in question.

There is another respect in which the absence of testimony of direct declarations or expressions by the decedent himself supports the opposition to this probate. Next in importance to the disposition of property made by a will, is, usually, the selection of executors and trustees, and, in the case of a large estate, especially, to which trusts are attached that may continue many years, if not a generation, the nomination of trustees, for the purposes, must needs be a matter of great care and solicitude, even to a capable testator, who has to consider, not only the business capacity, experience, discretion and integrity, of those to whom the trusts are to be confided, but also their present pecuniary responsibility, and their liability to misfortune in the future. So that when the

question of undue influence or circumvention arises, it is alike proper and necessary to consider what appointments of executors and trustees are made by the testator, and what powers are given to them, and also what were and are their personal relations to the testator and to the legatee, whose undue influence, fraud or wrong, is alleged as the cause of the will in question ; because, in many, if not in most cases, success in the design of a will procured through such means, to be made by a person in the condition of the decedent, depends largely on the favor, relations and partiality of the trustees or executors. In this case, although one son of the decedent is made an executor and trustee (and to have omitted the choice of at least one of his own kindred, would have given more ground for suspicion), the others are, as before stated, Henry Herrmann, George Herrmann, and their sister Magdalena Rollwagen, the widow.

I have already stated, as my opinion, that there is a significant defect of any testimony of express declarations or instructions by the decedent himself, as to the disposition of his property, as provided in the two papers. I observe, in this connection, on the subject of the appointment of executors, that Mr. Bellesheim testified that Mrs. Rollwagen stated to him, when she handed him the " Rosenstein will," that the desires of the decedent were that it should be amended only so far as to give the " new house " in Ninth street to her, and the substitution of Henry Herrmann for Mr. Beers, as an executor. If Mr. Bellesheim is to be credited, that he followed these instructions of Mrs. Rollwagen in these two respects, then it may be properly inferred that Mrs. Rollwagen was named as executrix in the " Rosenstein will." In her failure to produce the old will, and the absence of any explanation thereof, I am obliged to speculate as to the executors named therein.

All the *indicia* points to the fact that, besides Mrs. Rollwagen and Mr. Beers, Frederick Rollwagen, the eldest son of the testator, was an executor named therein, for he con-

tinued in that capacity in the amended will. Henry Herrmann was certainly not an executor named in the "Rosenstein will," for the instructions of Mrs. Rollwagen were that he should be substituted for Mr. Beers in the new will. It would be an extravagant speculation to entertain, if Henry Herrmann was not named, that his brother, George Herrmann (a small tradesman, with whom the decedent had no business relations, and scarcely any of a social character), was mentioned. It must be taken for granted that he was not an executor in the "Rosenstein will." The proponents do not claim that he was. How comes he then to be named in the amended will as an executor and trustee? The proponents have failed to even attempt to show that he was placed there by the directions of the decedent. Mr. Bellesheim, the draftsman, fails to even show that Mrs. Rollwagen represented that this was the desire of her husband.

Undoubtedly he must have come in through the direction of Mrs. Rollwagen and Henry Herrmann. The executors and trustees of the Herrmann family are as three to one of the family of the decedent. The addition of another Herrmann in the amended will "made assurance doubly sure" that there was but slight chance of the control of the decedent's estate passing away from the family of the widow. The appointment of one of the sons is not sufficient to remove my belief that the nomination of executors and trustees was not the decedent's own free will, for it would have been such an omission as to greatly increase the suspicion surrounding the preparation of the instrument.

The appointment of George Herrmann (considered by itself) is consistent only with the theory that there was contrivance exercised in procuring the insertion of his name, and that this fact was entirely unknown to the decedent. This circumstance is a very strong evidence that the papers propounded do not contain the true or full testamentary intentions of the decedent, outside of the questions of the equity or injustice of his dispositions.

In the Matter of Rollwagen.

Evidence was given by three or four of the witnesses, on behalf on the proponents, as to a desire evinced by the decedent for the birth of an heir. To one he said that he wished " to live so long as he could see the baby." To another, who asked Mrs. Rollwagen, at the time she looked delicate in health, what ailed her, he said that he was going to have another heir, and that he hoped it would be a girl. To another, who told him that it was dangerous to hold a baby — that " it was catching "— he said it was all right; and subsequently, when his wife was found to be pregnant, and the same witness asked him if she did not tell him that holding a baby was catching, he shook his head and said " yes." To two witnesses, when the baby-clothes were being made, and he was told the fact, he laughed. To one he said, in a despondent mood, that he was going to die; and when she told him that he must not die, that they were going to have a christening first, " when the little Rollwagen came to town," and that he and she were going to dance down in the parlor, he said " yes; " and to Henry Herrmann he said, if he should die, he wished Herrmann to help bring up the child.

This desire, and its probable realization (provided it was ever expressed), is presented by the proponents as an important reason for the extraordinary favoritism shown by the decedent to his wife, in the disposition of his property. To my mind, such a wish on the part of a paralyzed old man. (and one who was so helpless that, even at the time of the conception of the child by his wife, which, as the birth took place in the last week of November, must have occurred, according to the usual period of gestation, in February, 1873; and considering that he could move only with great difficulty, and nearly always with the assistance of others, and was suffering discomfort during the whole of the time), is strong evidence of mental weakness. He had heirs, three of whom were sons, who had arrived at the estate of manhood, with ages varying from twenty-two to forty; and he had several grandchildren, the children of his deceased daughter, Mrs. Brown-

ing. He had, therefore, no lack of descendants; and so far as the evidence shows, both children and grandchildren were devoted and affectionate, and were almost daily callers at the house of their father, during the last year or two of his life, except the youngest son, who was in California; and he, as the proofs show, was frequently writing letters to him. Their affection was manifested in so marked a degree that, although they must have noticed the influences surrounding and controlling their father, they seemed studiously to avoid any attempt to protest against them, lest they might disturb his peace of mind and, perhaps, hazard the chances of his recovery, and certainly add to his discomfort. There was, therefore, but little probability of his property passing away for want of heirs. If he expressed the desires, as stated, for an additional heir, they must have sprung from a morbid condition of the mind of an old man, conscious of his weakness, but influenced by an unnatural vanity at his advanced period of life, which was operated upon by those surrounding him to facilitate the accomplishment of their purposes.

After a most thorough examination of the testimony in the case, I am constrained to believe that the papers propounded are, in effect, the production of Magdalena Rollwagen and her brother, Henry Herrmann, rather than that of the testator. The lawyer who prepared both instruments was not he who, for many years, had been the counsel of the decedent (Mr. Geissenhainer), and who had drawn two wills for him — one in 1854 and another in 1860 — and who had had interviews with him in the years 1870, 1871 and 1872, of a professional character. That gentleman states that, during those three years, he could not understand anything stated by the decedent, and that the only means he had of judging of the desires of his client were the statements made by his wife of what she assumed the decedent said.

Henry Herrmann — whose sister is the principal beneficiary under the will, and who is himself the principal executor under it, if the instruments are sustained, and is given

thereby a livelihood for a long period to come — I am convinced, selected the lawyer to whom should be confided the duty of preparing the testamentary instruments. Mrs. Rollwagen gave to the lawyer the instructions for a change in the provisions of the will drawn by Mr. Rosenstein, enlarging the devise, by giving to her the new house, No. 312 East Ninth street, instead of the old house, No. 334 Ninth street, and also the instructions for preparing the codicil by which four additional houses were devised to her. The attesting witnesses, I am also convinced, were solely of their selection. Not one of the sons of the decedent was consulted by them in the preparation of these papers. Not one of them was present in the house on the day of the alleged execution of either instrument, and there were only present the attesting witnesses and Mrs. Rollwagen and Henry Herrmann. The latter even procured the book which was placed upon the lap of the decedent (who was too helpless to be moved to the table), and upon which book the codicil was placed when his name was signed. At the close of the alleged execution of each instrument, Mrs. Rollwagen entered the room and paid Mr. Bellesheim for his professional services. Not one word (other than the testimony of Theisz, if that is to be credited), was said by the decedent, unless the inarticulate sounds uttered by him in response to the statements of others, on either occasion, are to be so interpreted.

A paper which disposes of the property of a man, and the decrees of which are ratified only by death, is expressed by the Saxon term " last will." I fail to find in the testimony in this case any evidence of the exercise of the *will* of the decedent in the two documents propounded as embodying his testamentary wishes. They contain, in my judgment, simply the instructions of Mrs. Rollwagen written out by Mr. Bellesheim as scrivener. The proofs fail absolutely to show that they contain the will of the decedent, as conveyed by written instructions on his part, or by any utterances of which judi-

cial cognizance can be taken, as an assent to its provisions or the directions for its preparation.

Two of the subscribing witnesses assumed the inarticulate sounds to mean an assent to the statements made by one of them, who superintended the execution of the papers. In this assumption I am convinced they were in error. And if the decedent had testamentary capacity, it is the misfortune of the proponents that he was in such a physicial condition that he was not possessed of the power of expressing his wishes to the witnesses in a form which they could not misunderstand, and which would commend itself to the conscience of the court. In this failure, owing to the peculiar condition of the decedent, the law leaves the disposition of his property as defined by the statutes of distributions and descents. In the absence of such testimony — which it was absolutely impossible from the condition of the decedent, to obtain, even if there were not, on the other hand, so much testimony to militate against the idea of his having the power to express his wishes — it would be a straining after probate by the court to sustain the papers propounded as the will of the decedent, which appear to me to be inequitable and unjust to his lineal descendants, inasmuch as they allow so considerable a proportion of his estate to pass into the possession of a family alien to their blood, and to the prejudice of their own presumed natural claims.

The law in general disposes of property, in case of intestacy, according to principles most in harmony with natural ties. Nevertheless, the statute of wills recognizes the arbitrary right of a decedent to dispose of his property as may best accord with his own desires, even in the most inequitable manner, provided the requirements of the statute are complied with, and that he possessed at the time of the execution of the instrument the *animus testendi*, and was free from undue influence. This right, as to real estate, is subject to but one exception — that of dower of a widow in such real estate, which cannot be taken from her without her

In the Matter of Rollwagen.

assent.    While this testamentary power should be maintained by courts to the fullest extent, they must guard against the substitution, for the will of a decedent, of instruments which are not so much the expressions of his will as of other interested persons, who take advantage of their positions toward him, unduly to influence, and who improperly assume to direct their preparation and execution ; as, in my judgment, may in this case be truly said of Magdalena Rollwagen and Henry Herrmann.

In conclusion, I deem it plainly my duty upon the evidence, to decide that the due execution of either the will or codicil is not sufficiently proved ; and, even assuming that the decedent had testamentary capacity, and that the requirements of law respecting the forms of execution are shown to have been complied with, yet the evidence convinces me that neither of the two papers in question truly expresses the decedent's real purposes or intentions in the disposition of his property, and that he did not fully comprehend their provisions ; and, further, to decide that the proofs clearly establish that both instruments — and such execution thereof as is shown — were the result of undue influence and other unlawful means, rendering the same void ; therefore, that both will and codicil should be rejected as not entitled to admission to probate.